**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**WILLIAM K. DENEA, JR.,**

                **Plaintiff,**

v.

                                              **18-CV-779**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment. Dkt. No. 17. William Denea, Jr. ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act") seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for benefits. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. Nos. 12, 15. For the following reasons, Plaintiff's motion (Dkt. No. 12) is denied, and the Commissioner's motion (Dkt. No. 15) is granted.

## BACKGROUND

On May 16, 2014, Plaintiff protectively filed a Title II application for a period of disability and Disability Insurance Benefits, alleging disability beginning on January 1, 2009, due to a learning disability, right leg cellulitis and infection, illness

"once or twice a year," diabetes, a back injury, and a sore right shoulder. Tr. at 13, 202-08, 249.[1] Plaintiff's application was denied at the initial level and he requested review. Tr. at 13, 110-22, 124-37. Administrative Law Judge Sharon Seeley ("the ALJ") conducted hearings on September 21, 2016, and January 12, 2017. Tr. at 13, 29-109. Plaintiff, who was represented by counsel, testified as well as an impartial vocational expert. Tr. at 13, 29-109. On May 31, 2017, the ALJ issued a decision in which she found that Plaintiff was not disabled and therefore, not eligible for benefits. Tr. at 10-24. The Appeals Council denied Plaintiff's request for review, making the ALJ's determination the final decision of the Commissioner. Tr. at 1-5. Plaintiff thereafter commenced this action seeking review of the Commissioner's decision. Dkt. No. 1.

## **LEGAL STANDARD**

**Disability Determination**

An ALJ must follow a five-step process to determine whether an individual is disabled under the Act. *See Bowen v. Yuckert*, 482 U.S. 137, 140-142 (1987). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe," meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of

---

[1] Citations to "Tr. __" refer to the pages of the administrative transcript, which appears at Docket No. 7.

2

impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). 20 C.F.R. § 404.1520(d). If the impairment meets or medically equals a Listings criterion and meets the durational requirement (20 C.F.R. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for collective impairments. *See* 20 C.F.R. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If not, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

**District Court Review**

42 U.S.C. § 405(g) authorizes a district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). Section 405(g) limits the scope of the Court's review to two inquiries: whether the Commissioner's conclusions were based upon an erroneous legal standard, and whether the Commissioner's findings were supported by substantial evidence in the record as a whole. *See Green-Younger v. Barnhart*, 335 F.3d 99, 105-106 (2d Cir. 2003). Substantial evidence is "more than a mere scintilla." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009). "It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Id.* (emphasis added and citation omitted). The substantial evidence standard of review is a very deferential standard, even more so than the "clearly erroneous" standard. *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447-48 (2d Cir. 2012) (citing *Dickinson v. Zurko,* 527 U.S. 150, 153 (1999)).

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "'to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). If there is substantial evidence for the ALJ's determination, the decision must be upheld, even if there is also substantial evidence for the Plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46-47 (2d Cir. 1996); *Conlin*

*ex rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 384 (W.D.N.Y. 2015). Likewise, where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## **DISCUSSION AND ANALYSIS**

**The ALJ's Decision**

The ALJ analyzed Plaintiff's claims using the familiar five-step process described above. *Lynch v. Astrue*, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps). At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 1, 2009, his alleged onset date. Tr. at 15. At step two, she found that Plaintiff had the following severe impairments: diabetes, recurrent cellulitis, obesity, right shoulder osteoarthritis, adjustment disorder, and panic disorder. Tr. at 15-16.[2] The ALJ noted that Plaintiff had been diagnosed with other conditions that were controlled with medication and did not cause significant limitations on his ability to perform work activity. Tr. at 15-16. She also recognized Plaintiff's allegations of low back pain, hearing impairment, and learning disability, but noted that there was no diagnosis or evidence in the record supporting any of these conditions. Tr. at 16. Of particular relevance, the ALJ noted that based on Plaintiff's claims that he had "infrequent dyslexia," his school records were requested, "but the school responded that they do not maintain records from the dates of the claimant's schooling." Tr. at 16.

---

[2] This Court presumes the parties' familiarity with plaintiff's medical history, which is summarized at length in the papers.

At step three, the ALJ concluded that Plaintiff's impairments did not, either individually or in combination, meet or equal the Listings criterion, giving special consideration to Listing 1.02 (Major Dysfunction of a Joint(s) Due to Any Cause), 8.04 (Chronic Infections of the Skin or Mucous Membranes), 12.04 (Depressive, Bipolar and Related Disorders), and 12.06 (Anxiety and Obsessive Compulsive Disorders).  Tr. at 16-17.  Next, the ALJ found that Plaintiff retained the RFC to perform "less than a full range of sedentary work as defined by 20 C.F.R. § 404.1567(a).  Specifically, he can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, but cannot perform repetitive pushing or pulling with the upper extremities.  He can sit six hours in an eight-hour workday and can stand and/or walk four hours in an eight-hour work day but must be able to alternate after 30 minutes to sitting 10 minutes.  He can occasionally stoop, but cannot stoop repetitively and can never kneel, crouch, or crawl.  He can occasionally climb ramps or stairs, but never ladders, ropes or scaffolds.  He can occasionally reach overhead.  He can perform work that does not involve exposure to weather or to extreme heat or to humidity or wetness and does not require working with the hands in the water or other liquids.  Further[,] claimant can work in a low stress environment (meaning one with no supervisory responsibilities, no independent decision making required except with respect to simple, routine decisions, no more than occasional changes in work routines, processes or settings, and no changing work shifts or hours).  He can have occasional, incidental interaction with coworkers but not work in teams or tandem with others, and can have occasional, incidental interaction with the general public."  Tr. at 18.

Continuing to the fourth step, the ALJ found that Plaintiff had no past relevant work because he had always worked part-time, and this work had never reached substantial gainful activity levels. Tr. at 23. Based on Plaintiff's age (37 years old on his alleged disability onset date; 45 years old on the date of the decision), education (at least a high school education), and with the aforementioned RFC, the ALJ found that he could perform work that exists in significant numbers in the national economy, specifically, the jobs of surveillance system monitor (DOT No. 379.367-010), document preparer (DOT No. 249.587-018), and order clerk (DOT No. 209.567-014). Tr. at 23-24. Accordingly, concluded the ALJ, Plaintiff was not under a disability from January 1, 2009, through the date of her decision, May 31, 2017. Tr. at 24.

**Judgment on the Pleadings**

As noted above, the parties have cross-moved for judgment on the pleadings. Dkt. Nos. 12, 15. Plaintiff contends that the ALJ failed to develop the record with necessary intelligence testing (Dkt. No. 12-1, pp. 9-13), and that the highly specific RFC limitation regarding Plaintiff's ability to handle stress is unsupported by substantial evidence. Dkt. No. 12-1, pp. 13-18. The Commissioner contends that there was no need for intelligence testing as there was ample record evidence relating to Plaintiff's cognitive functioning, including two opinions from consultative doctors (Dkt. No. 15-1, pp. 15-22), and the ALJ supported her stress-related RFC limitation with substantial evidence (Dkt. No. 15-1, pp. 20-28).[3] Having reviewed the record, this Court finds that

---

[3] Plaintiff has not raised any objections to the ALJ's findings about his physical impairments. Although this Court has reviewed the record in its entirety, this decision focuses solely on the medical evidence relating to Plaintiff's alleged learning disability and ability to handle stress.

7

the ALJ did not err by not ordering intelligence testing and that the contested RFC limitation was substantially supported.

**The Record Relating to Plaintiff's Mental Health**

"Social Security proceedings are inquisitorial rather than adversarial." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (quoting *Sims v. Apfel,* 530 U.S. 103, 110-11 (2000)). "[I]n light of the essentially non-adversarial nature of a benefits proceeding," an "ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record. . . ." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks omitted). This duty includes "investigat[ing] the facts and develop[ing] the arguments both for and against granting benefits." *Sims,* 530 U.S. at 111. Under the applicable regulations, the ALJ is required to develop the claimant's complete medical history. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)-(f)).

Whether the ALJ has satisfied his or her duty to develop the administrative record is a "threshold question," which a reviewing court must answer before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g). *Craig*, 218 F. Supp. 3d at 261. That is, "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755

(2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel,* 174 F.3d 59, 63 (2d Cir. 1999)).

"The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *Merriman v. Comm'r of Soc. Sec.,* No. 14 Civ. 3510(PGG)(HBP), 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015) (internal citations omitted); *Craig*, 218 F. Supp. 3d at 268; *Franklin v. Comm'r of Soc. Sec.*, No. 17-CV-6894-JWF, 2019 WL 1230082, at *2 (W.D.N.Y. Mar. 15, 2019) (holding that "it is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment") (internal citations omitted).

At his hearing, Plaintiff testified that he has "infrequent dyslexia, trouble with numbers reversing themselves occasionally." Tr. at 71, 255. Plaintiff argues that the ALJ should have ordered intelligence testing regarding this alleged learning disability because Plaintiff's educational records, which were several decades old, had been destroyed. This Court finds that the destruction of the educational records did not create a gap in the record and the record overall was more than adequate for the ALJ to assess Plaintiff's ability to do work. It bears noting that despite the non-adversarial nature of social security proceedings, a claimant still bears the burden to produce

evidence proving that he or she is disabled.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *see also Bowen*, 482 U.S. at 146 n.5 ("It is not unreasonable to require claimant, who is in a better position to provide information about his own medical condition, to do so.")

Plaintiff cites no record evidence substantiating his self-diagnosis of "infrequent dyslexia."  Tr. at 77.[4]  None of Plaintiff's medical treatment providers or consulting doctors diagnosed him with a learning disability or other cognitive deficit that would interfere with his ability to do work.  Plaintiff's treating physician, Dr. Priscella Dale, observed that Plaintiff was alert and oriented with clear speech during his medical examinations.  Tr. at 387, 400, 406, 417.  At various times, Dr. Dale did opine that Plaintiff's judgment, intelligence, and life skills were less than ideal.  For example, on March 4, 2011, Dr. Dale noted that Plaintiff was "not using particularly good judgment" by "flatly refus[ing]" diabetic treatment and hospitalization,[5] but that Plaintiff "appeared to know what he [wa]s doing."  Tr. at 381-82.  Although Dr. Dale observed in August of 2014 that Plaintiff had "borderline low intelligence" and "limited skills," she did not formally diagnose him with an intellectual disability or psychiatric condition.  Tr. at 623.  The ALJ accommodated these limitations in the RFC, which restricted any independent decision making to simple, routine decisions.  Tr. at 22.

---

[4] Plaintiff testified, "I have infrequent dyslexia, trouble with numbers reversing themselves occasionally.  And I had a code from the League of the Handicapped, but I do not remember what that code was.  It was many years ago."  Tr. at 71.
[5] Plaintiff's weight fluctuated between high 300s and low 400s throughout the relevant period, generally exceeding the capacity of his doctor's scales.  Tr. at 382.  Moreover, Plaintiff was often non-compliant with his doctor's treatment recommendations.  Plaintiff declined to be hospitalized when his diabetes became "out of control" when he ran out of medication, and was "forced" to go to the doctor "by his boss."  Tr. at 381.

Consulting examiner Dr. Christine Ransom, who evaluated Plaintiff on September 5, 2014, for alleged learning disability and panic attacks, noted that Plaintiff completed two years of college,[6] "was in regular education,"[7] and "worked most of his life doing general labor." Tr. at 504. She noted that: Plaintiff was "cooperative and socially appropriate;" he was neat and casual with adequate hygiene and grooming, appropriate eye contact, coherent and goal directed thought processes, and a full range of affect with a neutral mood; he was oriented as to person, place, and time with intact attention and concentration; he had the ability to count backwards from 20, do simple calculations and serial threes without error; his immediate, recent and remote memory were intact; and he had average intelligence. Tr. at 504-506. According to Dr. Ransom, Plaintiff denied any cognitive symptoms and deficits, and reported that his concentration was good, that he enjoyed a variety of hobbies and interests, that he socialized with family and friends, was able to manage money, cook and prepare food, shop, and do laundry. Tr. at 504-506. Dr. Ransom concluded that "[t]his individual will show no evidence of difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule and learning simple new tasks." Tr. at 506. She concluded that the results of the evaluation were consistent with a mild psychiatric condition [panic disorder, currently mild] which will not significantly interfere with the claimant's ability to function on a daily basis." Tr. at 506.

---

[6] Plaintiff testified that he had an associate degree from Erie County Community College in Small Business Management with minors in Journalism and Advertising. Tr. at 70.
[7] In his benefits application, Plaintiff stated that he was in special education classes in school. Tr. at 250.

11

Dr. Hillary Tzetzo reviewed Plaintiff's medical records in September 2014 and assessed his mental limitations. Tr. at 115-16, 120. Based on her review, Dr. Tzetzo concluded that Plaintiff had no limitations in his abilities to understand, remember, and carry out simple instructions and tasks. Tr. at 115-16.

Moreover, Plaintiff did not present himself as a person with cognitive deficits. Plaintiff testified that he can read and write, do simple math, and that he possessed self-taught skills as a game designer although he "did not have any accreditation for that." Tr. at 71. He testified that he worked part-time rather than full-time at work so that he could take care of his disabled sister, because "[f]amily responsibility trumps income." Tr. at 80. At various points during his hearing testimony, Plaintiff used relatively sophisticated language such as "I wish to retract that," "It would have been too hard on my leg, my back, the constant lifting and bending and . . . being in a small, confined space," "I have a tendency to . . . retain heat," "[m]y doctor prescribed me to keep my leg elevated to restore . . . blood flow," and "[t]hat is a very highly variable number . . due to [the] reduced capacity of the new restaurant . . .," and "There was a large confrontation on Cinco de Mayo . . . . [regarding a] few mismatched plates, which would've looked unprofessional in a restaurant that was known for its high quality and standards." Tr. at 74, 82, 83, 84.

Plaintiff testified as follows about being fired from a restaurant job at a high end restaurant:

> "Chef Scott released me from employment because he did not feel he could work with me. . . . Chef Scott was very uncomfortable with anyone with

12

> manners. I try to be polite in my day-to-day conversations. . . . I have high standards[, w]hich is part of the reason why working at Walmart is killing me. But Chef Scott was unable to accept my standards, and I was unable to accept Chef Scott's, as he has a much lower quality function of food and dining expectations than Chef Dan. So we were incompatible."

Tr. at 85. While Plaintiff's testimony might support a finding that he was eccentric or had difficulty getting along with others, it does not effectively counter Dr. Ransom's and Dr. Tzetzo's shared conclusion that Plaintiff was capable of performing simple and routine tasks.

Having reviewed the record, this Court finds that it contained sufficient evidence for the ALJ to determine how Plaintiff's intellectual limitations would impact his ability to do work. Specifically, the destruction of Plaintiff's decades old educational records did not create an obvious gap in the record which required cognitive testing. *Rosa*, 168 F.3d at 79 n.5 (holding "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim"). Accordingly, this Court declines to remand on this basis.

**Stress Limitations on Plaintiff's RFC**

Plaintiff argues that the ALJ's determination that he retained the RFC for a limited range of low-stress work was not "tethered" to the medical evidence. Dkt. No. 12-1, pp. 14-18. This Court does not agree. As an initial matter, Plaintiff bears the burden of showing that he cannot perform the RFC found by the ALJ and is incapable of performing substantial gainful activity during the period in question. 20 C.F.R. § 1512.

Although the record shows that Plaintiff handled stress poorly at times, the factors cited by Plaintiff that caused him stress were largely episodic and/or situational rather than disabling. Moreover, Plaintiff's deficits in stress management would, in this Court's view, be mitigated by limiting him to low-stress work that was not performed in teams or in tandem with others as the ALJ directed. Tr. at 18.

By way of example, in 2011 and 2012, Plaintiff reported to Dr. Dale that he was in a "very stressful situation," due to a lack of transportation and his father being in and out of the hospital. Tr. at 354, 381. As a legal matter, deficits in mental health brought upon by situational stress are not necessarily disabling. *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("The medical record supports the conclusion that any depression experienced by Gates was situational in nature, related to marital issues, and improved with a regimen of medication and counseling."); *Gonzalez v. Comm'r of Soc. Sec.*, No. 6:07-CV-629, 2010 WL 55933, at *5 (N.D.N.Y. Jan. 5, 2010) (holding that substantial evidence supported the ALJ's finding that it was claimant's "situational periods of stress arising from problems with her children, her extended family, and financial difficulties, rather than any underlying psychopathology" that interfered with her ability to work). Moreover, the situational stressors in Plaintiff's life did not appear to disable him from work. Although he reported to Dr. Dale that he had "stress in his life" and was "exhausted taking care of everyone," he did make time to play Dungeons and Dragons once a week and was looking for other activities to "fill the time more often." Tr. at 354, 381. Plaintiff also testified that he only limited his work hours to part-time because he needed to care for his sister, not because he was unable to handle work

14

stress, and that he often worked 14 to 18 hours per day and performed maintenance tasks for his landlady.  Tr. at 79-80, 97, 105, 283.

As proof that he is disabled from even low-stress work, Plaintiff notes that in September of 2016, he was suspended from working at Walmart for 30 days after he argued with another employee and said, "I'd rather be bleeping dead than work here." Tr. at 697.  Construing his statement as a suicidal threat, Walmart management called the police who took Plaintiff to Erie County Medical Center for assessment.  Tr. at 710.  At ECMC, Dr. John M. Improta discharged Plaintiff after finding that he was not a suicide risk, and in fact:  was in no apparent distress; had a cooperative attitude; and had appropriate, calm behavior with coherent speech, a neutral, euthymic mood, an expressive, congruent affect, as well as organized, goal directed, reality based, concrete thought processes.  Tr. at 707.  Dr. Improta noted that Plaintiff was "very forthcoming with information, but somewhat sarcastic, childlike, . . . speak[ing] as a teenager would." Tr.  at 707.  Plaintiff was "mak[ing] jokes" during his evaluation such as, "Am I going to have to look at inkblots? Dam[n]!  I never get a chance to talk to a psychologist, thought I'd get to see an inkblot." Tr. at 710.

Substantial evidence supports the finding that the Walmart episode was an isolated incident and that Plaintiff did not, in fact, have suicidal ideations.  For example, Dr. Kathleen King, Plaintiff's treating physician, opined on September 29, 2016, immediately following the incident, that his conduct was a product of an altered mental status, because Plaintiff did not have any issues with work suspensions or

15

aggressiveness in the past.  Tr. at 698.  She noted that while Plaintiff "does have a somewhat odd outlook on life and affect," the outburst was not typical of him and the behavior correlated with some physical symptoms.  Tr. at 698.  At that time, Dr. King opined that Plaintiff's Walmart job did not present a health hazard to him "other than his ability to handle the stress," Tr. at 699, which she later noted had improved to the point that he "seem[ed] his usual self" in December 2016.  Tr. at 702.  Dr. King reported, Plaintiff "ha[d] a positive and attention seeking demeanor," and "though he express[ed] negative thoughts[,]" he "denie[d] depression or anxiety as usual."  Tr. at 704.  Plaintiff returned to work at Walmart on December 3, 2016, less than 3 months after he was suspended, and continued to work part-time as of his second hearing on January 12, 2017, apparently without incident.  Tr. at 36-37.  Based on this evidence, it cannot be said that Plaintiff's stress symptoms continued for a period of at least 12 months during the relevant period, the durational requirement to establish disability.  *Barnhart v. Walton*, 535 U.S. 212, 216-22 (2002).

This Court is also not persuaded that Dr. King's statement that part-time work at Walmart would not harm him "other than his ability to handle stress" was so vague as to trigger the ALJ's duty to recontact the physician.  An ALJ need only recontact a treating physician where the record is insufficient to determine the claimant's RFC.  *Jasen v. Comm'r of Soc. Sec.*, No. 16-CV-6153P, 2017 3722454, at *12 (W.D.N.Y. Aug. 29, 2017).  Dr. King's treatment records contained more than enough information to determine whether Plaintiff's ongoing ability to handle stress was compromised:  the doctor stated Plaintiff's conduct at Walmart was aberrant and likely

16

related to a physical condition and that he was back to "usual self" – denying depression or anxiety – within a matter of weeks. Tr. at 698, 704. These findings were corroborated by Plaintiff's successful return to part-time work at Walmart, and Dr. Ransom's and Dr. Tzetzo's conclusion that he had only mild difficulties dealing with stress. Tr. at 115-16, 120, 506. Where, as here, the evidence already in the record was "adequate for [the ALJ] to make a determination as to disability[,]" there was no need for the ALJ to develop the record further. *Perez*, 77 F.3d at 48.

Finally, this Court is satisfied that any deficits in Plaintiff's ability to handle stress on a regular basis were addressed by the limitations built into the RFC, which were supported by substantial evidence. All of the foregoing evidence shows that Plaintiff's stress was largely situational and episodic, and that Plaintiff could as a general matter, perform low stress work. Other evidence does as well. For example, Dr. Dale in June 2009, noted that Plaintiff reported some symptoms of depression, but did "not appear to be clinically depressed." Tr. at 407. The physician reported that the interruptions in Plaintiff's part-time work as a dishwasher were due to his cellulitis, and not to any inability to handle stress. Tr. at 408, 529, 533, 713. Plaintiff himself stated that his purported depression did not affect his ability to work "at all." Tr. at 670.

Plaintiff suggests that Dr. Dale's August 2014 opinion that he was "unemployable" due to "borderline low intelligence," "limited skills," and other physical limitations (Tr. at 623) compels a finding that he could not perform even low-stress work. This Court does not agree. In her decision, the ALJ afforded "great weight" to Dr.

17

Dale's factual findings, explicitly stating that "[t]he limitations suggested by Dr. Dale are reflected in the above [RFC]." Tr. at 22. This was entirely appropriate. The ALJ was not legally bound to adopt Dr. Dale's conclusion that Plaintiff was "unemployable," as "the ultimate finding of whether a claimant is disabled and cannot work . . . [is] reserved to the Commissioner." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal quotations and citations omitted).

Plaintiff disagrees with the ALJ's evaluation of the evidence. However, the substantial evidence standard is so deferential that "there could be two contrary rulings on the same record and both may be affirmed as supported by substantial evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 127 (2d Cir. 2012). That is, "once an ALJ finds the facts, [a reviewing court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). This is not the case here. For all of the foregoing reasons, this Court finds that the ALJ's decision is free from legal error and is supported by substantial evidence.

## **CONCLUSION**

For the reasons stated herein, Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is hereby DENIED, and the Commissioner's motion for

Judgment on the pleadings (Dkt. No. 15) is GRANTED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

DATED:	Buffalo, New York
	March 2, 2020

*s/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**